**SO ORDERED: June 22, 2011.**



**James K. Coachys**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MARK RANDALL JENNINGS and | ) | Case No. 07-06617-JKC-7 |
| SONYA JENNINGS, | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| GLOBAL ONE FINANCIAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 08-50039 |
| | ) | |
| MARK RANDALL JENNINGS and | ) | |
| SONYA JENNINGS, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

This matter comes before the Court on Plaintiff Global One Financial, Inc.'s ("Global One")

Amended Complaint against Debtors/Defendants Mark Randall Jennings ("Dr. Jennings") and

Sonya Jennings ("Mrs. Jennings") (together, the "Jennings").  The Court conducted a trial on the

Amended Complaint over the course of three days.  At the conclusion of the trial, the Court took the

matter under advisement and instructed the parties to file post-trial briefs and to submit proposed Findings of Fact and Conclusions of Law.  On April 13, 2011, the Court conducted a status conference and discussed with the parties the possibility of settlement.  Parties were given 45 days in which to negotiate a settlement.  At the conclusion of those 45 days, the parties reported to the Court that a settlement could not be reached.  They then filed, per permission granted by the Court at its April 13, 2011 hearing, supplemental post-trial briefs.[1]

Having reviewed the testimony and evidence presented at trial and the parties' respective filings and submissions, the Court now issues the following Findings of Fact and Conclusions of Law.

## Findings of Fact

1.    The Jennings were the sole officers, directors and shareholders of Back Pain Institute of Cleveland, LLC ("BPC"), a limited liability company that was organized under the laws of Ohio.

2.    Debtors were also part owners of Back Pain Institute of Indiana, LLC ("BPI"), a limited liability company organized under the laws of Indiana.  They became the sole owners of BPI in 2005.

3.    Mrs. Jennings also owned Sonya's Billings, a company used by BPI and BPC to collect accounts receivable.

4.    As explained in more detail below, Global One lent money to BPC pursuant to a Promissory Note and Security Agreement executed by the Jennings in favor of Global One.

5.    Entaire Global Companies, Inc. ("Entaire") is Global One's parent company.

---

[1]  The Court notes that this case proceeded to trial after the Court denied the Jennings' Motion for Summary Judgment.

Through its subsidiaries, Entaire markets and sells a product called Enshield, which allows clients to purchase life insurance and annuity products with financed premiums.

6.    Entaire Global Marketing Group Corporation ("EGMGC"), another subsidiary, serves as Entaire's marketing arm.

7.    Global One is the Entaire subsidiary that lends money to clients for purposes of the Enshield program.

8.    Entaire and its subsidiaries are headquartered in Atlanta, Georgia.  They share the same office and telephone number.

9.    Lincoln Benefit Life Company ("LBL") is the life insurance and annuity carrier that issued two life insurance policies to the Jennings with money lent to them by Global One.

10.    David E. Metzger ("Metzger") is the Managing Director and sole employee of Global One.

11.    James J. McBrayer ("McBrayer") is Entaire's Senior Vice President of Operations in charge of client services for Entaire and its subsidiaries.

12.    David Pyles ("Pyles")–in the capacity of "Technical Specialist"–marketed the Enshield product to the Jennings on behalf of EGMGC.[2]

13.    James Townsend ("Townsend") is a self-employed insurance agent who represents LBL, among others.  The Jennings had been long-time clients of Townsend, and it was Townsend who introduced them to Pyles.

14.    Prior to December of 2004, the Jennings had a $5 million life insurance policy for

---

[2]  Pyles entered into a "Technical Specialist Contract" with EGMGC in September of 2004, pursuant to which he was authorized to market Entaire's "strategies, products and services." The contract was signed by McBrayer–as Entaire's Vice President of Operations.  The contract was not signed by anyone at EGMGC. The contract specifies that it is governed by Georgia law.

which they were paying approximately $21,000.00 in premiums each year.

15.    Sometime in the Fall of 2004, Townsend introduced Pyles to the Jennings. After reviewing the Jennings' existing life insurance policy, Pyles suggested to them that they trade their existing insurance coverage for an Enshield product that would allegedly provide better coverage at a reduced rate. As explained by Pyles, the transaction would require an initial premium paid to LBL, with a second premium to be paid one year later. Pyles proposed that the Jennings finance these premiums through a $1 million loan from Global One so that the cash value of the policy or policies could be placed into them in a lump sum, thereby allowing the policies' values to grow faster and eventually neutralize any loan repayments that the Jennings would have to make in the future.

16.    The Jennings were unwilling to authorize BPC to make a loan for $1 million. Rather, they requested policies with a high death benefit and with low prepayment amounts. With that transaction in mind, BPC completed an application for a $200,000.00 loan from Global One to finance the acquisition of two life insurance policies to be issued by LBL (the "Policies").

17.    Global One approved[3] a $200,000.00 loan to BPC (the "Loan"), which was memorialized in a duly executed Promissory Note and Security Agreement (the "Agreement") in favor of Global One on November 23, 2004. Per the terms of the Agreement, Global One advanced $100,000.00 directly to LBL on December 9 and 10, 2004, as an initial prepayment of premiums on

---

[3]    As part of the application process, the Jennings submitted a Personal Data Form to Global One. Metzger testified at trial that Global One used the information contained therein to perform "preliminary underwriting." He further testified that Global One also generally does a background check and runs a credit report, although it is not clear from his testimony that Global One necessarily followed that practice with respect to the Jennings. In any event, Metzger's testimony does not support a finding that Global One made any specific inquiry into the amount or collectability of BPC's accounts receivable as of late 2004. If Global One had, it presumably would have discovered that BPC was having sporadic collection problems at that time.

the Policies.    Subsequently, LBL issued the Policies on Dr. Jennings and Mrs. Jennings, respectively, on December 23, 2004.  Each of the Policies provided an initial death benefit of $5 million.  A second $100,000.00 premium was scheduled to be advanced to LBL one year later, in December of 2005.

18.    As security for the Loan, BPC granted Global One a security interest in the Policies, as well as in "[a]ll of the accounts and health care insurance receivables . . . of [BPC] now or hereafter existing; and . . . [a]ll proceeds of the foregoing" (the "Accounts Receivable" or, together, the "Collateral").[4]

19.    The Agreement also contains a covenant prohibiting the dissolution of BPC. Specifically,  the Agreement provides:

> [BPC] will do or cause to be done all things necessary to preserve and keep in full force and effect its legal existence as an entity and its rights and franchises. [BPC] will not change its name, type of organization or jurisdiction of organization without each Holder's consent in writing.

20.    The Agreement also states that "[b]orrower will collect all accounts in the ordinary course of business unless each Holder consents in writing.  The Borrower will not sell its accounts receivable to any other person."

21.    The Agreement further provides:

> During the term of the Agreement, and any extensions and renewals thereof, Borrower shall furnish to each Holder:
> (i) an annual financial statement prepared in form acceptable to the Holders, as soon as practicable, but no later than 90 days after the Borrower's fiscal year-end;
> (ii) interim financial statements for each fiscal quarter of the Borrower (other than

---

[4]  During their negotiations over the Agreement, the Jennings and Pyles discussed using BPI's assets as collateral for the Agreement.  Because the Jennings had other partners at the time in that business, it made more sense to use BPC's assets exclusively as collateral.  The point being that Pyles–and presumably Global One–were aware of BPI's existence from the inception of the Agreement.  Per his testimony, Metzger also indicated that he was aware of BPI's existence.

5

the last quarter of the fiscal year) in form acceptable to the Holders, as soon as practicable, but no later than 20 days after the Borrower's fiscal quarter-end;

(iii) copies of business and personal tax returns of the Borrower and Principal no later than April 30th, unless an extension has been filed, in which case a copy of said extension must be received by April 30th. Business and personal tax returns that have been granted an extension will be due no later than 30 days after the filing of same;

(iv) such other information regarding Borrower's financial condition, results of operations and business prospects as the Holders may from time to time request, for the purpose of answering any questions any Holder may have regarding the operations of Borrower, provided that such process does not unreasonably interfere with the performance of their duties to the Borrower; and

(v) current personal financial statements of the Principal (personal financial statements shall be deemed "current" so long as they are dated not more than 6 months prior to such time as they are received by the Holders.)[5]

22.     Failure to abide by any of the covenants listed above, along with insolvency, liquidation and dissolution, constitute events of default under the Agreement.

23.     Per its terms, the Agreement is governed by Georgia law.

24.     Global One properly perfected its security interest in the Accounts Receivable by filing a financing statement with the Ohio Secretary of State.

25.     LBL paid Pyles and Townsend, each, a $40,000.00 commission in conjunction with the Loan. LBL paid McBrayer a $20,000.00 commission.[6]

26.     Beginning in mid-2004, BPC experienced intermittent problems in obtaining claim reimbursement from the various insurance companies with which it worked. Sometime in early 2005, BPC's primary insurance company, Medical Mutual, stopped paying claims related to BPC's use of "VAX-D" therapy.[7] This reimbursement issue severely affected BPC's solvency and

---

[5]  The Court heard no evidence to suggest that the Jennings complied with these reporting provisions or that Global One ever pressed them to do so.

[6]  It is not clear from the evidence whether an additional set of commissions was to be paid upon the second $100,000.00 disbursement.

[7]  "VAX-D" is a non-surgical treatment for low back pain.

6

ultimately led the Jennings to close BPC in late February 2005.

27.     In early 2005, the Jennings told Pyles and Townsend that BPC was experiencing financial difficulties and that they were closing BPC and its bank accounts  The Jennings also asked them for instructions as to how to proceed with respect to the Loan and Agreement.  Pyles told the Jennings that he would get to back to them after discussing the matter with Global One.

28.     Per his deposition testimony, Pyles relayed this information to McBrayer in early 2005.  At most, Pyles then instructed the Jennings to transfer their "obligations" under the Loan to BPI.  Dr. Jennings' own testimony does not indicate that Pyles ever explicitly told him to "transfer" BPC's accounts receivable to BPI, nor does his testimony indicate that he explicitly asked Pyles for instructions with respect to the Accounts Receivable.

29.     Notwithstanding this lack of clarity, the Jennings began depositing BPC's outstanding accounts receivable into BPI's bank account at First Merchant's Bank (the "BPI Account").  Such deposits ultimately totaled $235,682.20 for the period beginning February 1, 2005, and ending October 24, 2006.  During this same period, BPI collected $1,181,490.88 of its own receivables that were deposited into the BPI Account.  The Jennings paid approximately $185,000.00 to Sonya's Billings for collection services for *both* BPI's and BPC's accounts receivable during this period. The Jennings also took draws from the BPI Account after BPC had closed to pay for their living expenses.[8]

30.     The Jennings did not ever seek or obtain Global One's written consent to close BPC.

---

[8]     Dr. Jennings stated in his deposition that even while BPC was still in business, he and Mrs. Jennings typically paid themselves from BPI's account and not BPC's.

31.     In July of 2005, Mrs. Jennings sent a facsimile on BPI letterhead to Metzger[9] stating that "[w]e must change autopay to account below.  Routing info is on check."  Below these instructions was a copy of a blank check from the BPI Account.

32.     The Jennings, through the BPI Account, continued to make regularly monthly payments on the Loan until February of 2007.

33.     Beginning in 2006, BPI began experiencing its own claim reimbursement and cash flow issues.  It eventually became clear that it, too, would likely have to close.

34.     During the spring and fall of 2006, the Jennings and Pyles had multiple conversations about how to proceed with the Loan.  Pyles and McBrayer, in turn, also had multiple conversations, which were recorded in the ordinary course of Entaire's business (the "Conversations").[10] The Conversations reflect that Pyles and McBrayer discussed a number of scenarios in light of the Jennings' financial issues, e.g., cancelling the policies with LBL through what is known in the industry as a "free look"; cancelling the second $100,000.00 distribution; and lowering the face value of the policies from $5 million to $1 million.  McBrayer and Pyles also repeatedly discussed the possibility that they would have to repay the commissions they had received from LBL with respect to the Loan.

35.     It is not clear how much of the Conversations McBrayer or Pyles shared with Metzger, but it does appear that Global One was made aware that the Loan was in some degree of distress–or at least McBrayer lead Pyles to so believe.  During the Conversations, McBrayer

---

[9]    The facsimile was addressed to "David Pyles," but does not indicate to which telephone number it was sent.  Metzger testified that he received the facsimile himself, although it is not clear whether he received it directly from the Jennings or from Pyles.

[10]    The Conversations were transcribed, produced by Global One through discovery, and introduced into evidence by Global One at trial.

repeatedly stated that he was under some degree of pressure from Global One to resolve the situation with the Jennings.

36.    Additionally, Metzger testified that McBrayer asked him to hold off on making the second $100,000.00 advance that was to be paid in December of 2005 under the terms of the Loan. The Court finds, then, that McBrayer must have discussed the situation, at least generally, with Metzger by late 2005. Metzger's electronic notes also include an entry from a conversation with Pyles on December 20, 2005, stating, "[c]ompany moved back to Indiana; David Pyles getting me updated information and new checking account info."

37.    Notwithstanding this information, Global One made no further inquiry or investigation into BPC's operations or finances at that time. Rather, Global One insisted throughout trial that it did not know–and had no reason to know–that BPC had closed until September of 2006, i.e., when Metzger reportedly discovered from the Ohio Secretary of State's website that BPC had dissolved in 2005.[11]

38.    Sometime in September of 2006, Global One–with the help of Entaire's in-house counsel–prepared an amendment to the original Agreement (the "Amendment"). In relevant part, the Amendment provides:

> In connection with the dissolution of the Original Borrower, Back Pain Institute of Indiana, LLC, an Indiana limited liability company, hereby agrees to undertake all obligations, liabilities, rights and responsibilities under the Original Agreement as amended by the Amendment and each of the Financing Documents to the extent required. Back Pain Institute of Indiana, LLC shall be substituted as the "Borrower" pursuant to this Amendment in connection with the Original Agreement and each of the Financing Documents executed in connection therewith and herewith . . . The

---

[11]    Metzger testified that he discovered this information in the course of preparing the Amendment described in paragraph 38, *supra*. It is not clear to the Court why Metzger would have done a U.C.C. search for BPC when Global One was taking, per the Amendment, a security interest in *BPI's* accounts receivable.

parties hereto acknowledge that this Amendment is intended to amend and supplement each of the Financing Documents and evidence Borrower's agreement to each of the terms and provisions thereof. The Holders hereby waive any defaults under the terms of the Original Agreement by the Original Borrower and/or the Borrower as a result of such dissolution.

39.     Mrs. Jennings ultimately received a copy of the Amendment via an email from Pyles dated October 4, 2006. Because the Jennings did not immediately execute and return the Amendment to Global One, Metzger contacted Dr. Jennings on October 20, 2006. During the conversation, Dr. Jennings requested more time to review the Amendment.

40.     Unbeknownst to Global One, the Jennings closed BPI on October 26, 2006.

41.     Metzger's subsequent attempts to reach the Jennings regarding the Amendment were unsuccessful. The Jennings never executed the Amendment. They did, however, continue to make monthly payments on the Loan until February 1, 2007, at which time they made no further payments. Then, and only then, did Global One issue a Default Notice, dated February 5, 2007, to BPC and the Jennings.

42.     In February of 2007, Dr. Jennings prepared and filed U.C.C. financing statements with the Indiana Secretary of State that purported to give his father and mother-in-law liens on BPI's and BPC's accounts receivable. No corresponding security agreement appears to exist with respect to the financing statements. Dr. Jennings testified that the financing statements were filed in relation to a class action lawsuit then pending in Arizona.

43.     Global One filed a collection action against BPC in the United States District Court for the Northern District of Georgia on June 10, 2007.

44.     The Jennings filed a voluntary Chapter 7 bankruptcy petition on July 17, 2007.

45.     Global One obtained a default judgment on June 12, 2008, against BPC in the amount

10

of $137,272.32, plus prejudgment interest.

46.     Global One asserts that it did not learn that  BPC "transferred" the Accounts Receivable to BPI until it attempted to collect its judgment.

## Conclusions of Law

1.     In its Amended Complaint, Global One argues that the Jennings' "transfer" of BPC's accounts to BPI and their subsequent use of the Accounts Receivable constitute "conversion" and that the resulting debt, i.e., the amounts due and owing under the Agreement, should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

3.     Global One bears the burden of proving, by a preponderance of the evidence, that the Jennings' alleged indebtedness to it is excepted from discharge.  *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).  Exceptions to discharge "are confined to those plainly expressed in the Code . . . and are narrowly construed in favor of the debtor."  *DeKalb County Div. of Family & Children Servs. v. Platter (In re Platter)*, 140 F.3d 676, 680 (7th Cir.1998) (internal citations omitted).

4.     To state a claim under § 523(a)(6), a creditor must prove that the debt in question was caused by a "willful and malicious injury."  In *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d (1998), the United States Supreme Court answered the "pivotal question" of whether § 523(a)(6) covers "acts, done intentionally, that cause injury . . . or only acts done with the actual intent to cause injury."  *Id.* at 61, 118 S.Ct. at 977.  Concluding that it required only the latter, the Court affirmed an Eighth Circuit opinion holding that a malpractice judgment

11

against a physician could be discharged because "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at 64.

     5.     In so holding, the Court plainly rejected the argument that an intentional act causing injury is a willful injury when it stated:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, *i.e.,* "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself." Restatement (Second) of Torts §§ 8A, Comment a, p. 15 (1964) (emphasis added).

*Id.* at 61-62 (emphases in original).

     6.     Maliciousness as used in § 523(a)(6) has been defined by the Seventh Circuit as a "conscious disregard of one's duties without just cause or excuse; it does not require ill-will or specific intent to do harm." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994). As explained by the Bankruptcy Court for the Northern District of Illinois in an October 2010 opinion:

> The application of *Thirtyacre's* definition of maliciousness in every scenario is not readily apparent. It has sometimes been difficult to gauge what types of nonaggressive conduct, *i.e.,* conduct that is not motivated by ill will, qualifies as being taken in "conscious disregard without just cause or excuse." Indeed, it has been observed that it is necessary for courts to determine malice on the totality of the circumstances because "there has been surprisingly little judicial and scholarly commentary discussing the degree or nature of 'wrongfulness' that constitutes 'malice' under section 523(a)(6)." *In re Bressler,* 387 B.R. 446, 455 (Bankr.S.D.N.Y.2008)(quoting *Viewer v. Jacobs ( In re Jacobs),* 381 B.R. 128, 139 (Bankr.E.D.Pa.2008)). It can at least be said, however, that the "key to maliciousness under § 523(A)(6)" is "consciousness of wrongdoing." *See In re Young,* 428 B.R. 804, 818 (Bankr.N.D.Ind.2010); *In re McCarthy,* 179 B.R. 876, 880 (Bankr.N.D.Ill.1995).

*In re Vaccaro*, 2010 WL 4053914 (Bankr.N.D.Ill.2010).

7.      The Supreme Court has stated that "a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances." *Davis v. Aetna Acceptance Corp.*, 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1973).   In some circumstances "[t]here may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed.  In these and like cases, what is done is a tort, but not a wilful and malicious one." *Id.*

8.      "[A] conversion accomplished with the knowing acquiescence of the creditor will not support a § 523(a)(6) exception." *In re Meeker v. McGinnis (In re McGinnis),* 586 F.2d 162, 163 (10th Cir.1978).  In *Bennett v. W.T. Grant Co. (In re Bennett)*, 481 F.2d 664, 666 (4th Cir.1973) (per curiam), the court noted that the conduct of a creditor could defeat the availability of the § 523(a)(6) exception to discharge.  Specifically, if the creditor acquired knowledge of the transaction at a time when it could have asserted its security interest in the property and failed to take reasonable steps to protect its security, the indebtedness secured thereby should be discharged.  *See also Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52, 54-55 (11th Cir.1995) (citing *McGinnis* and *Bennett*).

9.      Admittedly, the Court has had great difficulty in applying the standards for willful and malicious injury as articulated by *Geiger* and *Thirtyacre*.  On their face, the standards do not seem overly complicated, but a more careful reading of them–as is certainly required in the case at hand–has caused the Court a great deal of consternation.

10.      The Court does not appear to be alone in its confusion.  As observed by the Honorable Robert E. Grant in *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449 (Bankr.N.D.Ind.

13

2001), "*Geiger* seems to have created almost as much consternation as it set out to resolve. In part, this is because the Court never said what 'willful' is; only what it is not–it is not negligence, recklessness or a breach of contract." *Id*. at 453 (citing *Geiger*, 523 U.S. at 61-62, 118 S.Ct. at 977). Similarly, the Honorable J. Philip Klingenberger observed in *Bank Calumet v. Whiters (In re Whiters)*, 337 B.R. 326 (Bankr.N.D.Ind.2006), that the "implications" of *Geiger* "have engendered a tremendous diversity of opinion as to the construction to be given to § 523(a)(6) post-*Geiger*." *Id*. at 334.

11.    The Court has studied countless *post-Geiger* opinions from courts within the Seventh Circuit and beyond. No one interpretation of *Geiger* stands out to the Court as absolutely "correct," as it is difficult to adopt an interpretation susceptible to being readily applied to the myriad of fact patterns that potentially fall subject to § 523(a)(6). That said, the Court does tend to agree with the interpretation stated in *In re Russell*, at least as it relates to collateral conversion cases. In *Russell*, Judge Grant offered the following post-*Geiger* analysis of "willful":

> In addressing the meaning of "willful" for the purposes of § 523(a)(6), the Supreme Court did not require a subjective inquiry to determine whether a debtor intentionally injured a creditor. Although a subjective intent to harm will certainly fulfill the requirements of the statute, *Geiger* does not need to be and should not be read as requiring proof of a subjective motivation. It held only that § 523(a)(6) required an intentional injury rather than an intentional act. *Geiger*, 523 U.S. at 61, 118 S.Ct. 974 ("nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."). This standard may be satisfied with something less than a showing that the debtor's actions were motivated by a specific desire to harm the creditor or its collateral.
>
> The key to applying *Geiger* without unnecessarily injecting subjectivity into the analysis is to accurately identify the creditor's true injury. It is easy to confuse the unique damage caused by the debtor's action with the creditor's true injury and it is that confusion that leads to the construction of causal chains linking action with injury. Nonetheless, the true injury is not the unique or case specific damages that are somehow monetized and then memorialized in a money judgement. Those damages are only the manifestation of the true injury. They indicate the magnitude

14

of the creditor's injury, not whether an injury has occurred. Admittedly, the magnitude of the injury will influence whether a creditor is interested in pursuing the matter and what, if anything, it may recover should it do so. Nonetheless, the lack of damage does not necessarily mean that no injury has occurred, it means only that no real harm has come of it. Indeed, it is the recognition that there can be injury without harm that lies behind the opportunity to recover nominal damages.

The creditor's true injury occurs on an abstract level. It is the debtor's invasion of the creditor's legally protected right. The court should focus on this injury, as opposed to the resulting damage, when it asks whether the injury was intentional. When it does so, the answer will usually be relatively obvious because the debtor's action *is* the injury. For example, in a case involving assault and battery, the true injury is not the creditor's broken jaw, but rather, the unconsented to touching that produced the broken jaw. Consequently, the question to ask is not whether the debtor intended to break the creditor's jaw, but instead, whether the debtor intended to hit the creditor. In defamation cases, the true injury is not the damage to the creditor's reputation; it is the publication of falsehoods about the creditor that led to the damaged reputation. Consequently, the proper question is not whether the debtor intended to injure the creditor's reputation, but instead, whether the debtor intended to publish the defamatory remarks. **Similarly, in the conversion of collateral scenario, the true injury is not that the creditor's debt goes unpaid. The true injury is that the creditor's collateral was wrongly or improperly disposed of and that the proceeds were used for purposes other than payment of the obligation that property secured. *See In re LaGrone*, 230 B.R. 900, 904 (Bankr.S.D.Ga.1999). Consequently, the proper question is not whether the debtor intended that its secured creditor would go unpaid. Instead, the question to ask is whether the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than the payment of the debt that property secured. If so, there is an intentional injury.**

*Id.* at 454-455 (emphasis added).

12.    In applying *Russell* to the instant case, the Court begins by identifying Global One's "true injury." Admittedly, the Court has struggled to make that determination, as the case at hand is arguably more complex than the typical collateral conversion case, in part because BPC was authorized to use its accounts receivable. As such, did Global One's true injury occur when BPC closed without Global One's consent, when the Jennings began depositing BPC accounts receivable into the BPI Account, or when the funds were actually spent or otherwise dissipated? How do issues

15

regarding credibility, the burden of proof and mitigation affect how the Court determines if and when the "true injury" occurred?

13.    The Court declines to conclude that Global One's true injury occurred when the Jennings closed BPC without Global One's consent.[12]  Clearly, this was breach of the Agreement, but at that point in time, the Jennings had done nothing to impair Global One's interest in the Accounts Receivable.

14.    Global One insists that the Jennings "converted" the Accounts Receivable when they deposited them into the BPI Account.  While such argument is appealing, it belies relevant commercial law.  Revised Article 9-315, which has been adopted in both Georgia and Indiana, states, in relevant part, that "a security interest . . . continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition." *See* GA. CODE ANN. § 11-9-315(a); IND. CODE § 26-1-9.1-315(a).  Thus, the Court cannot conclude that the true injury occurred when the Jennings merely deposited the Accounts Receivable into the

_____

[12]  In this regard, the Court also rejects the Jennings' insistence that Pyles was acting as Global One's agent.  Under Georgia law, an agency relationship arises whenever one person, expressly or by implication, authorizes another to act for him.  *Atlanta Market Center Mgmt., Co. v. McLane*, 503 S.E.2d 278 (Ga.1998).  But to be an agent, one must be "more than an employee delegated . . . to look after certain accounts."  *Id.*  One must have "authority, real or ostensible, to create obligations on behalf of the principal, bringing third parties into contractual relations with it."  *Id.*  "[I]t is the principal's conduct that is crucial to the creation of apparent or ostensible authority."  *Fed. Paper Bd. Co. v. Harbert-Yeargin, Inc.,* 92 F.Supp.2d 1342, 1351 (N.D.Ga.1998).  "In other words, 'apparent authority is not predicated on whatever a third party chooses to think an agent has the right to do, or even upon what the agent says he can do, but must be based on acts of the principal which have led the third party to believe reasonably the agent [has] such authority.'"  *Holy Fellowship Church of God in Christ v. Brittain,* 523 S.E.2d 93, 95 (1999)(quoting *Thompson v. Gen. Motors Acceptance Corp.,* 389 S.E.2d 20 (1989)).
    Per his contract with Entaire, Pyles was authorized to "solicit and procure  applications for Entaire strategies, products and/or services . . . to service contracts issued as a result, to collect the initial premium or pre-payment or expenses thereon; and to furnish receipts for same."  According to the contract, then, Pyles did not have actual authority to enter into contracts on behalf of Entaire or Global One.  There is also insufficient evidence in the record to conclude that he had ostensible authority either.  There are no "acts of the principal" the Court can point to that would have led the Jennings to believe that Pyles was Global One's or Entaire's agent.

BPI Account.

15.     In the Court's view, then, the true injury occurred when the Jennings spent or otherwise dissipated the funds. Surprisingly and problematically, however, Global One did not present *any* evidence as to when the Jennings actually spent the Accounts Receivable. While the evidence includes information regarding deposits to the BPI Account, there is no evidence as to withdrawals from the BPI Account or as to the Account's historic balance. The Jennings admittedly took draws from the BPI Account, but the Account included not only BPC accounts receivable, but over $1 million in BPI accounts receivable as well.

16.     Certainly, the Court could reasonably infer that the BPI Account was *eventually* depleted in that BPI eventually closed and the Jennings filed for bankruptcy, but it is otherwise left to speculate as to exactly when the Jennings spent the funds.[13] This lack of evidence would not be as problematic, at least not particularly so, but for the fact Global One was required to take reasonable steps to protect its interest in the Collateral. In the Court's view–and as explained in detail below–there came a point in time where Global One had sufficient information about the Jennings' and BPC's financial distress to warrant *some* affirmative action beyond mere negotiation and discussion. Without evidence as to the BPI Account's historical balance, however, the Court cannot conclude that the proceeds from the Accounts Receivable had been spent, in whole or in part, at that point in time. In other words, the Court cannot definitively conclude that Global One was injured by the Jennings' actions, regardless of whether they were "willful and malicious," rather than by their own inaction. This poses a rather substantial burden-of-proof problem for Global One–the

_____

[13]   The evidence shows that Global One's automatic withdrawal for the Loan payment due in February was rejected due to insufficient funds.

party charged with proving the elements of § 523(a)(6) by a preponderance of the evidence.

17.     Those failures start with Global One's own decided lack of due diligence at the inception of the Loan.  There is nothing in the record to suggest that Global One took any steps to quantify the value of the Accounts Receivable as of late 2004, by which time BPC was already experiencing cash flow problems.  While this, in and of itself, does not insulate the Jennings from liability under § 523(a)(6), it suggests to the Court that from the outset of their relationship, Global One took a rather relaxed approach to the Accounts Receivable.

18.     This trend continued to the extent that Global One apparently never enforced the terms of the Agreement that required BPC to submit quarterly and annual financial statements, as well as tax returns.[14]  In the Court's view, this alone is a glaring lack of oversight.

19.     Even by Global One's version of events, Metzger arguably should  have known that something was amiss with the Jennings and/or BPC by late 2005–when McBrayer presumably[15] informed him that the Jennings did not want to go forward with the second $100,000.00 disbursement.  At about this same time–in December of 2005–Metzger learned from Pyles that the Jennings had "moved" BPC "back" to Indiana.  In the Court's view, then, Global One had sufficient information to prompt further inquiry by, at least, late 2005.

20.     However, as explained in detail below, the Court does not find Global One's version of events to be particularly credible.  While Global One has attempted to portray itself as innocently unaware of BPC's financial straights, the evidence paints a very different picture.

---

[14]  The Jennings were also required to submit personal financial statements and tax returns.

[15]  The Court says "presumably" because the testimony itself is, interestingly, rather vague as to when they had this conversation.  Because the distribution was to be made in December of 2005, the Court presumes that McBrayer and Metzger discussed it at that time.

21.     It is undisputed that Pyles knew, as of February of 2005, that BPC was closing.  Per his deposition,[16] Pyles stated that he relayed that information to McBrayer in early 2005.  McBrayer insists, however, that he did not learn of BPC's financial problems until May of 2006.  Such insistence is difficult to accept.  During what is allegedly McBrayer's first conversation with Pyles about the Jennings–on May 5, 2006–he seems to already have some knowledge of the situation.  McBrayer attempted to explain this away at trial by suggesting that perhaps another Entaire employee had already briefed him about it or that Pyles may have left a voicemail message.[17]  The Court concludes that it is much more likely that Pyles and McBrayer had simply already discussed the matter.  The tone and content of the May 5th conversation certainly suggest as much:

PYLES:  Jay.

MCBRAYER:  Hey, what's going on bud?

PYLES:  Okay.  What's up?

MCBRAYER:  Not anything real good.  In essence, the surrender charges on these policies–

PYLES:  Yeah.

MCBRAYER:  –will take every single–everything that they have in there out of it.

PYLES:  So there's no cash.

MCBRAYER:  Yeah.  There's no cash.  So on a $200,000 deal, if they go to get out, not only will they owe us the $100,000 they're going to be under, because of the exposure, they're also going to owe in prepayment penalty about eight grand on top of that.  So you're looking at about–they're about a hundred and eight grand or so

---

[16]  Pyles did not testify at trial, but his deposition was admitted into evidence.

[17]  McBrayer testified that it was Entaire's policy to record calls with clients or their brokers.  Presumably, then, if another Entaire employee spoke to Pyles about this matter, such calls would have been recorded.  There was no suggestion at trial, however, that there were any other recorded telephone conversations that bore on this matter.

in the hole.

PYLES: Holy cow. You know, looking at this from his standpoint, he's going to go ballistic. Because all he was doing was paying premiums before. Now he owes $108,000, right?

MCBRAYER: Mm-hmm. But I mean, my understanding was that they were doing this originally–and they wanted that high face value for like 10 years, right?

PYLES: Yep. But [ph] things [ph] changed–

MCBRAYER: And then–

PYLES: –because of his whole financial picture has changed, and that's all he's able to think about right now. I'm just trying to be able not to end up [chuckles] in a world of crap because of this. . . . I mean, he's–I have no question that he's documented that and that we've documented everything we need to document from that standpoint. I just don't want to have to go there. But I know what's going to happen if I tell him, okay, well if you cancel it, you'll owe us $108.000. . . . So you now have no coverage and you can still continue to pay $108,000. . . . That's not going to work at all, so–

MCBRAYER: So, I mean, the best thing for him to do is to go ahead, you know, with the second payment, get the second payment in, and then let's reduce that fee down so it doesn't turn up any of the cash.

PYLES: If we reduce the face, the surrender value stays the same?

* * * * *

PYLES: If he–if he does his legal maneuver here, where does that leave us?

MCBRAYER: His legal maneuver as in bankruptcy?

PYLES: Yeah.

MCBRAYER: I mean, you know, we're first in line. . . . So, I mean, he could go bankruptcy, but we'd immediately–you know, we'd immediately go after the policy and any shortfall we'd immediately, you know, lockbox his AR. And start charging default interest until we're done collecting. . . . So his interest goes up through the roof.

PYLES: There is–he's not even old enough to try to do a life settlement, is he?

MCBRAYER: Let me–why can't–what's the issue that he can't stay in the program?

20

I've been out of the loop on the majority of this.

PYLES:  I think it's just the monthly payment.  I mean, his whole thing is payments. . . . He's just losing money, and he's had some problems, so his finances are really crappy right now.

MCBRAYER:  Right.

This dialogue does not suggest to the Court that this is their first conversation about the Jennings; McBrayer seems far too familiar with the situation.  This contradiction, raised significant concerns about McBrayer's credibility and, in turn, Global One's entire case.

22.    Beyond raising concerns over credibility, the Conversations strongly suggest that both Pyles and McBrayer were personally motivated to keep the Loan from imploding.

23.    As quoted above, Pyles seems concerned that the Jennings will soon realize that they made an imprudent deal with Global One.  During their June 12, 2006 conversation, Pyles told McBrayer that Dr. Jennings was "getting scary to the point that he wants to blame somebody, so–other than himself . . . [a]nd that makes me nervous that the agent that basically did the most of the negotiating on this is Jim Townsend, and he's dying of cancer, so– . . . I'm next on the list."

24.    The following exchange between Pyles and McBrayer on May 31, 2006, is telling:

PYLES:  I'm just trying to salvage the best . . . and not have some kind of a frickin' lawsuit on my hands . . . [b]ecause, you know, [Dr. Jennings's] just totally bugged about the fact that he's got to pay $800 a month and he's got nothing– . . . left after 10 years."

MCBRAYER:  Well, I mean, isn't he the one that chose to do that–

PYLES:  Yeah.

MCBRAYER:  I mean–

PYLES:  Well, we–

MCBRAYER:  –and my assumption is you've well documented and noted your files

21

on that.

PYLES:  Mm-hmm.  Oh, yeah.  The problem is that the introductory agent he's leaning on pretty heavy, the guy that introduced me to him. . . that guy's got cancer.

MCBRAYER:  Oh.

PYLES:  So I know where shit's going to fall, you know . . . . It's going to flow, so.

MCBRAYER:  Well, I mean you've well documented it, I mean, because you know, he specifically asked to have that.  I mean, that's–you know, in our notes, back up–I mean, just to give you an idea of our notes on this case.  I have to go back to our other system to see our notes on it. But, you know, the idea is, obviously, he was the one that chose to go with a face that high.

PYLES:  Yeah.  And that's his contention is [sic], "I don't know why the heck I even had this much."  I said, "I know, Mark, but this is what you had in place when we started all this already. . . . You had ULs and you had terms."  And then he goes back to the other agent that sold him all the shit and why did he bother selling him–

MCBRAYER:  Mm-hmm.

PYLES:  You know, I didn't do this.  I walked in to try to help.  So at any rate, okay. I have to call him because he's left me three messages.

* * * * *

MCBRAYER:  And like I said, [Global One's] collateral position is just getting eaten away.

PYLES:  Okay.

MCBRAYER:  So, if you if you can give me a head [sic] up, like I said, because if not, probably what they're going to do is they're just going to go, fine, we're going to [cancel] the contract and we're going to charge him a $4,000 prepayment penalty . . . and he's not going to have an option of it. . . . You know, worse case scenario is that they say, you know, we don't want to do this and they call the entire thing–pull their collateral and nail him, you know for prepayment and everything else.

* * * * *

MCBRAYER:  [Y]ou know, that's what we don't want.  We–you know, we don't want [Global One] getting to a point going, well, he can't make a decision, so we're going to make a decision for him.

25.    At the risk of belaboring the point, the following exchange from Pyles and McBrayer's June 26, 2006 conversation is also telling:

> PYLES: I forgot. I've been talking with Lincoln trying to get them to see if they'd reverse this case out.
>
> MCBRAYER: Mm-hmm.
>
> PYLES: Of course, that's going to require a commission chargeback.
>
> MCBRAYER: Right.
>
> PYLES: I didn't know if you guys would want to play that game or not, because that's the best way to make this thing go away.
>
> MCBRAYER: Right. Um, you know, I mean, if you know, we're going to charge back commission. I mean, as long as–because we'll recoup some of the commission on the prepayment penalty.
>
> PYLES: Okay.
>
> MCBRAYER: A little bit, not much, but it's worth making it go away.
>
> PYLES: Right. Yeah, trust me, we want this to go away.

26.    At several points during the Conversations, McBrayer and Pyles also discuss the possibility of having to disgorge their commissions if Global One called a default on the Loan. Obviously, then, they had quite a financial stake in preserving the Loan.

27.    Taken as a whole,[18] the Conversations strongly suggest that Pyles and McBrayer were personally motivated to pacify the Jennings in some way in order to salvage the Loan. It seems plausible, then, that McBrayer tacitly allowed or ignored the Jennings' continued use of the

---

[18]  The Conversations, when read as a whole, make the Court rather uneasy. For one thing, some of the dialogue almost seems rehearsed, as if Pyles had been coached as to what to say. For another, there is a somewhat nefarious subtext to the Conversations that suggests to the Court that McBrayer and Pyles are attempting to hide something from the Jennings. In short, there is little in the Conversations that enhances Global One's credibility.

Accounts Receivable.  It also seems plausible that McBrayer may have deterred Metzger from taking any prompt or aggressive action against BPC and the Jennings.  In any event, it seems clear that McBrayer was sufficiently aware[19] of the situation and should have appreciated that the Accounts Receivable were at some degree of risk unless Global One affirmatively acted to protect them, i.e, through the use of a lock box or, in the very least, by obtaining and reviewing BPC's financial statements and tax returns.

28.    The Court also has issues with Metzger's credibility.  During his conversations with Pyles in the summer of 2006, McBrayer repeatedly indicates that Global One had been made aware of the situation with Jennings.  For instance, in his May 16, 2006 conversation with Pyles, McBrayer states that "[Global One] is leaning on me to get something done as far as . . . the collateral side." On May 31, 2006, McBrayer tells Pyles that "[Dr. Jennings] needs to make a decision on what he's doing or [Global One] is going to make that decision for him."  In that same conversation, McBrayer tells Pyles to be in touch because he knows "[Global One] in the next week or so is going to want to know what they're doing with it because . . . their collateral position is just getting eaten away." In McBrayer's June 12, 2006 conversation with Pyles, he states that "[Global One] is going to want us to either MEC [cancel the Policies] the contract or they're going to want to call default."

29.    The Court cannot reconcile these statements with Metzger's assertion that he was unaware of the Jennings' and BPC's financial distress until September of 2006–at least not without

---

[19] Admittedly, McBrayer is an employee of Entaire, Global One's parent company.  Per Metzger's testimony, however, McBrayer was explicitly charged with "customer service."  That included handling troubled loans, like the one at issue here.  Metzger was specifically aware that McBrayer, along with Pyles, was working to resolve issues with the Loan.  Under one of several theories–alter ego, apparent or ostensible agency and joint venture–the Court, therefore, imputes whatever knowledge McBrayer had of the Jennings' and BPC's financial distress to Metzger, regardless of whether McBrayer actually shared that knowledge with Metzger.  *See Kissun v. Humana, Inc.*, 479 S.E.2d 751 (Ga.1997).

concluding that someone is not being truthful.

30.     As noted earlier, McBrayer presumably told Metzger in late 2005 that the Jennings did not want to go forward with the second $100,000.00 disbursement.  Inexplicably, Metzger testified that he did not really question that information or press McBrayer for any explanation.  This strikes the Court as so incredible that it prompts concern over Metzger's credibility.  Similarly, Metzger testified that he thought nothing of it when Pyles informed him that the Jennings had "moved" BPC "back" to Indiana.  Again, this strikes the Court as rather incredible.

31.     The Court also notes that certain details of Metzger's Affidavit, which Global One offered in opposition to the Jennings' summary judgment motion, were shown during cross-examination to be false or, in the very least, misleading.  Metzger himself admitted at trial that certain of his statements were "incorrect."

32.     In the Court's view, Global One has simply not presented a credible or coherent story to explain its actions or, more precisely, its inaction.  The evidence is replete with contradictions, conflicts of interest, illogical explanations and subterfuge, leading the Court to have a rather dim view of Global One's credibility as a whole.  In particular, the Court does not find credible Global One's assertion that it did not know–and had no reason to know–that BPC had closed until September of 2006.  Clearly, McBrayer knew that the Jennings and their businesses were having financial problems well before that.  How much before is not clear, as the evidence presented by Global One is both contradictory and lacking in credibility.[20]   Thus, the Court can only generally

---

[20]  As noted earlier in the Court's findings, Pyles testified in his deposition that he told McBrayer that BPC was closing in early 2005.  Pyles admittedly poses his own credibility issues.  For one, he did not testify during trial, and the Court was without an opportunity to assess his credibility in open court.  Second, as explained by the Court in its September 9, 2009 summary judgment ruling, Pyles made two somewhat contradictory affidavits–one used by Global One and the other used by the Jennings–that raised questions as to his credibility.  Third, it seems clear from the Conversations that he had his own interests to protect with

25

conclude that Global One knew of BPC's distress at some point before May of 2006.

33.     McBrayer's and Metzger's claimed ignorance of the gravity of the Jennings' financial situation strikes the Court as rather disingenuous. If they did not appreciate the implications of the Jennings' financial problems to the security of the Accounts Receivable, then it was largely because they failed to obtain the financial documents required of BPC under the Agreement. Had they simply enforced the Agreement, they presumably would have discovered the need for prompt action.

34.     Once it learned of BPC's financial distress, Global One did not take reasonable steps to protect its Collateral. At nearly every turn, the evidence shows that Global One either failed to perform adequate due diligence or ignored what to the Court were obvious red flags. Metzger, himself, admitted that so long as the Jennings continued to make the Loan payments, they were not inclined to declare a default and proceed against the Collateral.[21] Even when Metzger discovered–by his own account–that BPC had closed, Global One did not take any prompt action to determine the state of the Accounts Receivable. Rather, it offered the Amendment to the Jennings, pursuant to which Global One was willing to waive any previous defaults if BPI assumed the obligations under the Agreement. Nothing in Global One's evidence suggests that it actually performed any due diligence on BPI at that point in time. If Global One had, it would have discovered that BPI, too, was insolvent, or at least headed toward insolvency. In other words, Global One yet again took a

---

respect to the Jennings and the Loan.

[21] In this regard, the Court rejects Global One's argument that the Loan payments themselves were part of the Jennings' scheme to willfully and maliciously injure Global One. The Jennings had no way of knowing that the payments, in and of themselves, would deter Global One from protecting its security. They were otherwise open with Pyles and Townsend about their financial difficulties. It is difficult to conclude that they were trying to keep those difficulties secret from Global One. It seems more plausible that they were assured that so long as they kept making their payments–something they believed they had the capacity to do until BPI began having cash flow problems–that everything would be okay.

rather cavalier approach to securing the Loan and protecting its interests.

35.    The ambiguity in the evidence as to when Global One should be charged with taking some affirmative action to protect itself would arguably be less problematic if the Court had any evidence as to the BPI Account balance from early 2005 to late 2006.  In the absence of such evidence, the Court has no meaningful way to parse blame in this case, assuming that any blame should even be placed on the Jennings.  Even if Global One was legitimately in the dark for *any* period of time after BPC closed, the Court has no way to ascertain whether the Accounts Receivable were dissipated during that period of time.  It bears emphasizing that the Jennings had over $1 million in unencumbered BPI accounts receivable at their disposal, too.  Thus, the Court cannot presume that they were necessarily using BPC's accounts receivable at any given point in time. Stated differently, Global One has not established that the injury it sustained was caused by the Jennings' actions, rather than by its own inaction.

36.    For the reasons stated above, the Court cannot conclude that Global One has demonstrated, by a preponderance of the evidence, that it is entitled to judgment under § 523(a)(6). As previously stated,  "if the creditor acquired knowledge of the transaction at a time when it could have asserted its security interest in the property and failed to take reasonable steps to protect its security, the indebtedness secured thereby should be discharged."  *See Bennett,* 481 F.2d at 666. The evidence before the Court, coupled with Global One's lack of credibility and failure to establish when (or if) the Accounts Receivable were spent, leads the Court to conclude that Global One failed to take reasonable steps to protect its security.  As such, the Jennings' alleged indebtedness to Global One is subject to discharge.

37.    The Court will issue a Judgment consistent with these Findings of Fact and

27

Conclusions of Law contemporaneously herewith.

###

Distribution:

James E. Rossow, Jr.
Steven Eric Runyan
Harley K. Means
John M. Rogers
UST